OPINION OF THE COURT
Diane A. Lebedeff, J.
This motion raises a surprisingly unaddressed question — and, hence, an issue of first impression — of whether, and if so under what circumstances, in a case on the trial calendar, a defendant in a personal injury action may be granted access to raw data resulting from tests administered to plaintiff by plaintiff’s expert. In addition, defendant challenges the admissibility of the test results and any resulting scientific testimony, which raises separate and distinct Frye and trial admissibility issues.
Defendant Tishman Construction Corporation of New York sued herein as Tishman Construction Co., Inc., moves for access to the raw data produced by approximately 11 tests of plaintiffs memory, perception and personality administered by testing professionals acting under a neurologist’s control and supervision. Each test produces numerical scores, each has a scale or percentile ranking, and many have a stated level of statistical confidence. Such testing is relatively common where, as here, it is claimed that a plaintiffs injury has produced a loss or diminution of employment opportunities.
Plaintiff claims he has impairments as a consequence of a depressed skull fracture resulting from a trip and fall at a construction site. He asserts the testing documents his impaired or diminished concentration, short term visual memory, attention to details, visual/spatial perceptual processing, and visual scanning, resulting from neuropsychological impairment secondary to cerebral dysfunction due to traumatic brain injury, as well as post concussion syndrome. The plaintiff is now approximately 65 years of age, suffers from a chronic muscle dis *356 ease known as polymyocitis, and retired following the incident which occurred on March 30, 2000.
Request for Testing Data in a Trial-Ready Case
Defendant requests access to the raw data from testing administered by plaintiffs designated expert. The testing was disclosed in the report of plaintiffs expert which was served after the matter was placed on the trial calendar.
If the testing had been administered during the discovery phase of litigation, the issue of access to raw data from testing in a tort case would be weighed under normal discovery standards (Knauer v Anderson, 184 Misc 2d 621 [Sup Ct, Erie County 2000, Howe, J.]). Additionally, if discovery were ongoing, defendant could have requested that plaintiff be tested by defendant’s own expert, with due recognition that such a request is not automatically approved.[1]
However, more often than not and as is true here, an expert report is furnished after the matter is on the trial calendar and it is that report which discloses the testing. Plaintiff objects that disclosure of raw testing data should not be permitted now that the matter is on the trial calendar. In this instance, for reasons of both practicality and policy, and taking into consideration the number of tests administered and the methods of analysis used, the court holds that the application for disclosure of the testing raw data made when the matter is on the trial calendar will be viewed under the standards applicable to pre *357 trial discovery and that the application for access to the raw data will be granted.
As to practicality, a primary consideration is whether a typical trial presentation of the raw data is appropriate to this case. Commonly, absent a pretrial review of raw data, the data simply would be presented during testimony by an expert (Gayle v Port Auth. of N.Y. & N.J., 6 AD3d 183, 184 [1st Dept 2004] [medical expert opinion is to be supported by “relevant examples and data” and it is “the jury’s prerogative to resolve (any) conflicting testimony”]). If interpretative assistance were needed by opposing counsel, such party may have its own expert present in the courtroom while the testing expert testifies (People v Santana, 80 NY2d 92, 100 [1992], rearg dismissed 81 NY2d 1008 [1993] [“reasons for exclusion do not apply to expert witnesses. It has been pointed out that the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves before the jury”] [citations and internal quotation marks omitted]).
The typical trial approach is ill suited to the situation present here. Because a battery of tests was administered, it cannot be envisioned that a defense expert swiftly and almost instantaneously — for each test — could confirm the scoring, reassess the percentile rankings and statistical levels of confidence, and review the propriety of the conclusion drawn by plaintiff’s expert, and then coolly assist defense counsel to prepare a comprehensive, thoughtful examination of plaintiffs expert. To delay access to the raw data until the trial, in this case, could be projected to lead to extensive trial delays for defense preparation of both a voir dire and cross-examination bearing upon the tests and their results.
In relation to policy, the court finds support for disclosure under CPLR 3101 (d) (1) (i), which governs the content and timing of disclosure of an expert’s report. This provision permits courts to assure no prejudice results when the expert report is furnished “an insufficient period of time before the commencement of trial to give appropriate notice thereof,” by allowing the court, in its discretion, to “make whatever order may be just” (CPLR 3101 [d] [1] [i]; see Siagha v Salant-Jerome, Inc., 271 AD2d 274, 274 [1st Dept 2000], lv denied 96 NY2d 714 *358 [2001] [determination regarding application of CPLR 3101 (d) approved as “a proper exercise of discretion”]; see 44 NY Jur 2d, Disclosure § 96 [“Expert’s Identity and Subject of Testimony”]).
The same policy of procedural fairness and permitting the opposing party an opportunity for proper trial preparation which underlies CPLR 3101 (d) (1) (i) also has been recognized in the context of criminal cases. In People v Almonor (93 NY2d 571 [1999]), the Court addressed a defense failure to furnish in a timely fashion raw data underlying one expert’s tests prior to the trial. The Court of Appeals observed that “CPL 250.10 contemplates timely disclosure so that the trier of fact may benefit, after psychiatric issues are sharpened and engaged to the fullest extent possible. At the other extreme, and to be avoided, lies the prospect of psychiatric hide and seek” (93 NY2d at 581-582 [citation omitted]). Further, in People v Santana (supra, 80 NY2d at 99, quoting Ake v Oklahoma, 470 US 68, 82 [1985]) it was noted that “without the assistance of a psychiatrist to . . . assist in preparing the cross-examination of a State’s psychiatric witnesses, the risk of an inaccurate resolution of [psychiatric] issues is extremely high.” Indeed, only in child custody disputes have reasons been found to limit the disclosure of raw test results and related notes.[2]
Accordingly, in this personal injury litigation by reason of the considerations set forth above, the court finds it proper to compel the disclosure of the raw data of the multiple tests administered to plaintiff. The moving party shall not be precluded from access to raw testing data merely because the opposing expert’s testing was done and report prepared after this matter was on the trial calendar. The raw data shall be provided within 10 days of the date of this decision.
To the extent that Tishman alternatively asks that the testimony of neurologist Dr. Jason W. Brown be precluded, the application is denied. Plaintiff has complied with the formalities of expert disclosure under CPLR 3101 (d). Preclusion could, of *359 course, be sought in the event that the testing data is not produced (Andruszewski v Cantello, 247 AD2d 876, 877 [4th Dept 1998] [preclusion permitted for failure to produce the complete files of treating psychologists, “(t)he fact that plaintiffs doctors were uncooperative in producing reports does not relieve plaintiff of her burden of providing defendant with the documentation necessary to prepare a defense”]).
Procedures Relating to a Frye Inquiry and a Trial Foundation Inquiry
Although Tishman requests a Frye inquiry, in actuality, the defendant is requesting entry into the pretrial procedural anteroom in which there is an exchange of scientific information and the court thereafter may be asked to limit the potential evidentiary tender of a scientific opinion to a jury.[3] In this pretrial anteroom, two distinct requests can be made: (1) for a Frye inquiry, or (2) for an inquiry into whether a sufficient trial foundation is available to render the scientific information admissible.
In either instance, a moving party must interpose a motion in limine seeking a preliminary order excluding the introduction of anticipated evidence. A motion in limine challenges evidence *360 which is claimed, to be inadmissible, immaterial, or prejudicial, or requests a limitation on the use of evidence (State of New York v Metz, 241 AD2d 192, 198 [1st Dept 1998]).
Such a motion is not governed by any particular formal requirements (Wilkinson v British Airways, 292 AD2d 263, 264 [1st Dept 2002] [“there is no requirement that an in limine motion be made in writing and be in accordance with CPLR 2214. The court, therefore, properly considered defendant’s oral application”]). However, in relation to a motion addressed to scientific evidence, movant should support its motion in limine by reference to some scientific material of evidentiary value, for a court cannot undertake an independent review of scientific literature (George D. Marlow, From Black Robes to White Lab Coats: The Ethical Implications of a Judge’s Sua Sponte, Ex Parte Acquisition of Social and Other Scientific Evidence During the Decision-Making Process, 72 St. John’s L Rev 291 [spring 1998]).
If the motion in limine asserts that an expert will tender an opinion which cannot be made with a reasonable degree of scientific certainty, the movant is requesting a Frye inquiry. A Frye inquiry has a limited scope for “the test pursuant to Frye v United States (293 F 1013) poses the . . . elemental question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally” and “attention must focus on the acceptance of such evidence as reliable by the relevant scientific community” (People v Wesley, 83 NY2d 417, 422 [1994]; People v Angelo, 88 NY2d 217, 223 [1996] [test is “general acceptance of the procedures and methodology as (being) reliable within the scientific community”]). The judicial goal is to assure that an expert opinion be tendered with a reasonable degree of certainty, a question well explored in Matter of Miller v National Cabinet Co. (8 NY2d 277, 289-290 [I960]), which held that expert testimony about a “possibility” and an “informed guess” fell short of the reasonable degree of certainty standard.
Either in the alternative or in addition, the challenge may assert that some practical deficiency renders testimony about scientific data or opinion inadmissible and request a trial foundation inquiry. The trial foundation inquiry is addressed to “the scientific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial” (People v Wesley, supra, 83 NY2d at 429). Absent a specific pretrial motion in limine, in *361 the general course, “arguments concerning . . . adherence to accepted procedures for collection, storage or analysis of such evidence ‘relate [ ] to trial issues of foundation and weight of the evidence’ ” (People v Kelly, 288 AD2d 695, 696 [3d Dept 2001]). If it is determined the evidence is admissible, the weight of the evidence is a question for the trier of fact (People v Middleton, 54 NY2d 42, 51 [1981]).
Both of these inquiries best are raised prior to the commencement of trial. Such timing often is required on the criminal side (People v Almonor, supra, 93 NY2d at 582 [addressing expert scientific testimony to be tendered by a psychiatrist, “the court will direct compliance and the exchange of information well enough before trial so that the parties may prepare adequately, in full confidence that the (scientific) issues will be appropriately addressed,” and the pretrial “opportunity for discussion and distillation” of scientific opinions renders a court “able to evaluate the parties’ positions and deal with whatever subtleties or complications arise”]).
In relation to the conduct of the civil litigation, there is an evolving preference for early presentation because scientific issues may involve a time-consuming analysis of an expert’s methodology and the pertinent literature (see, e.g., Clemente v Blumenberg, 183 Misc 2d 923 [Sup Ct, Richmond County 1999, Maltese, J.] [accident reconstruction]; Gallegos v Elite Model Mgt. Corp., 195 Misc 2d 223, 226 [Sup Ct, NY County 2003, York, J.] [secondhand smoke, pretrial motion permits presentation of affidavits and exhibits, without the cost of paying for an expert’s time to testify]). Further, the rights of the civil litigants are best protected by an early presentation, for in limine decisions are appealable only if the order will “limit[ ] the issues to be tried . . . clearly involves the merits of the controversy . . . and affects a substantial right” (Scalp & Blade v Advest, Inc., 309 AD2d 219, 224 [4th Dept 2003] [discussing at length appealable and nonappealable decisions on motions in limine]; see also, 4 NY Jur 2d, Appellate Review § 43 [“Pretrial Orders as to Admissibility of Evidence”]).
An early careful approach to scientific inquiries should allay some of the doubts expressed by commentators as to whether the judiciary has sufficient skills to determine scientific matters (see, e.g., Craig Lee Montz, Trial Judges as Scientific Gatekeepers after Daubert, Joiner, Kumho Tire, and Amended Rule 702: Is Anyone Still Seriously Buying This?, 33 UWLA L Rev 87 [2001]). It appears to this jurist that the advocacy system itself *362 offers the best assurance of a balanced decision on complex scientific issues, in that it contemplates that such issues will be presented to a court by well-prepared attorneys, utilizing their analytical and explanatory skills and advancing reliable scientific information tendered by well-credentialed scientists. Such a record offers the best opportunity for a court to exercise the well-honed judicial skill of distinguishing a silk purse from a sow’s ear.
In this instance, defendant has not made the requisite first start of justifying the need for a Frye hearing by showing a lack of scientific support on relevant issues (compare, Selig v Pfizer, Inc., 290 AD2d 319, 320 [1st Dept 2002] [once defendant showed “the absence of any clinical data supporting their expert’s theory that there is a causal link ... it was incumbent upon plaintiffs to set forth other scientific evidence based on accepted principles showing such a causal link”]). Nor does defendant now challenge — and indeed it will be unable to do so until it examines the raw data from the testing — the trial foundation of the testing and any evidence which might flow from such testing.
Accordingly, the request for either a Frye or trial foundation inquiry is denied at this time without prejudice to renewal after defendant’s receipt and analysis of the raw data.

. When a case is not yet on the trial calendar, a testing request by the de-, fendant is governed by normal discovery principles (Kavanagh v Ogden Allied Maintenance Corp., 92 NY2d 952, 953-954 [1998] [“Although the plain language of CPLR 3121 (a) authorizes physical or mental examinations ‘by a designated physician,’ and defendant’s vocational rehabilitation expert was not a medical doctor, CPLR 3121 does not limit the scope of general discovery available, subject to the discretion of the trial court, under CPLR 3101”]; see also, for discussion of relevant considerations, Freni v Eastbridge Landing Assoc., 309 AD2d 700 [1st Dept 2003]).
Psychological or vocational testing does fall under the medical examination provisions of CPLR 3121 when such testing is “providing only a diagnostic tool for the physician, [and the nonphysician administering tests] is only acting as an agent for, and under the direction of, the designated physician” (Paris v Waterman S.S. Corp., 218 AD2d 561, 564 [1st Dept 1995], appeal withdrawn 87 NY2d 860 [1995]) but not otherwise (Barenboim v Schindler El. Corp., 250 AD2d 413, 413 [1st Dept 1998] [“disclosure under CPLR 3121 does not extend to an examination of a party by someone other than a physician”]; see also Agli v Turner Constr. Co., 241 AD2d 312, 313 [1st Dept 1997] [noting Uniform Rules for Trial Courts contains the same restriction]).

. In child custody disputes, “special circumstances” have been found to support a limitation of access to test results and psychiatric notes (Ochs v Ochs, 193 Misc 2d 502, 506-509 [Sup Ct, Westchester County 2002, Spolzino, J.]; Nicholson v Nicholson, 2 Misc 3d 1002[A], 2003 NY Slip Op 51713[U] [Sup Ct, Kings County 2003, Sunshine, J.]; see also, Feuerman v Feuerman, 112 Misc 2d 961 [Sup Ct, Nassau County 1982, McCaffrey, J.] [access to raw data of county psychiatrist and psychologist found not justified by special circumstances, including raw data from thematic apperception, Rorschach, figure drawing, and sentence tests]).

. This opinion does not address whether the scientific evidence or opinion to be tendered is admissible under Frye v United States (293 F 1013 [DC Cir 1923]), nor does it weigh the federal rules governing the admissibility of such evidence or opinions under the Supreme Court’s more recent trilogy of expert evidence opinions on such rules (Daubert v Merrell Dow Pharms., Inc., 509 US 579 [1993]; General Elec. Co. v Joiner, 522 US 136 [1997]; Kumho Tire Co., Ltd. v Carmichael, 526 US 137 [1999]). Excellent discussions of those issues are advanced by David E. Bernstein (Frye, Frye, Again: the Past, Present, and Future of the General Acceptance Test, 41 Jurimetrics J 385 [spring 2001]), and Erica Beecher-Monas (The Heuristics of Intellectual Due Process: a Primer for Triers of Science, 75 NYU L Rev 1563 [Dec. 2000]), and an example of a detailed exploration of the intricacies of such issues under the federal rules is contained in Ruiz-Troche v Pepsi Cola of Puerto Rico Bottling Co. (161 F3d 77 [1st Cir 1998]).
New York cases, both reported and unreported, are collected in articles by Michael D. Shalhoub (“Frye” Hearings in Medical Malpractice Actions— Judges Act as Gatekeepers for Deciding Admission or Preclusion of Experts, NYLJ, Mar. 15, 2004, Supp, at 6, col 1), by Stephen W Schlissel and Lisa R. Nakdai (‘Frye’ and ‘Daubert’ Questions Crop Up in Family Law Arena, NYLJ, July 1, 2003, at 16, col 1), and by Michael Hoenig (Trend Towards Hearings on Experts, NYLJ, Oct. 16, 2002, at 3, col 1). The Daubert factors are not utilized as a consolidated, single bright line standard in New York courts, although any one factor might serve as a basis for an objection to some aspect of the admissibility of scientific testimony, such as the two separate inquiries addressed in this decision, or to the qualification of a scientific expert as a witness.