Doctors Allergy Formula, LLC v Valeant Pharms. Intl. (2023 NY Slip Op 50469(U))

[*1]

Doctors Allergy Formula, LLC v Valeant Pharms. Intl.

2023 NY Slip Op 50469(U)

Decided on May 12, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 12, 2023
Supreme Court, New York County

Doctors Allergy Formula, LLC, Plaintiff,

against
Valeant Pharmaceuticals International, Defendant.

Index No. 651597/2018

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 004) 111, 113, 114, 115, 116, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 248, 249, 250, 251, 252, 253, 254, 255, 256, 347, 348, 349 were read on this motion for MISCELLANEOUS
The following e-filed documents, listed by NYSCEF document number (Motion 005) 112, 117, 118, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 350, 351, 352, 353, 354, 355, 356 were read on this motion for SUMMARY JUDGMENT(AFTER JOINDER)
At the heart of this fraud and breach of contract dispute is an asset purchase agreement governing the sale and distribution of an ocular allergy testing system. Plaintiff alleges that defendant made material misstatements of fact and failed to disclose material facts that, had they been known, would have affected plaintiff's decision to enter into the purchase agreement. Plaintiff further alleges that defendants failed to make required sales payments and otherwise perform its material obligations under the agreement (Complaint, NYSCEF doc. no. 139). Defendant asserts a counterclaim for tortious interference (Amended Answer and Counterclaims, NYSCEF doc. no. 78), and both parties assert competing claims for breach of the covenant of good faith and fair dealing.
In motion sequence 004, defendant Valeant Pharmaceuticals International, moves, in limine, to preclude plaintiff's expert, Edward J. Buthusiem, from testifying at trial and "at the summary judgment stage" (NYSCEF doc. no. 111).
In motion sequence 005, defendant moves, pursuant to CPLR 3212, for an order granting summary judgment as to its counterclaims against plaintiff Doctors Allergy Formula, LLC and dismissing plaintiff's complaint.
Motion sequences 004 and 005 are consolidated herein for disposition.
FACTUAL ALLEGATIONS
Plaintiff, a company founded in 2013 by Dr. Howard Loff (Dr. Loff), developed an ocular allergy testing system (the allergy testing system) which enables ophthalmology offices to test for regionally specific allergens from different regions across the country. 
On October 15, 2015, plaintiff and defendant (now known as Bausch Health Americas Inc.), entered into an asset purchase agreement by which plaintiff sold defendant the rights to the allergy testing system. Defendant agreed to use commercially reasonable efforts in the promotion, marketing, and sale of the allergy testing system. Also, pursuant to the agreement, defendant was to make an initial purchase price of $1.00 and "milestone payments" would be made if certain product sales milestones were achieved.
The sales milestones were:
1. $1 million upon the sale of 40,000 applicators;
2. $4 million upon the sale of 200,000 applicators;
3. $4 million upon the sale of 400,000 applicators;
4. $5 million upon the sale of 600,000 applicators;
5. $5 million upon the sale of 1,200,000 applicators; and
6. $5 million upon the sale of 4,000,000 applicators. 
Defendant's Factual Allegations
Upon reaching the first milestone in February of 2016, defendant paid $1 million to plaintiff. Defendant maintains that between September of 2017 and December of 2017, plaintiff paid at least 27 ophthalmology practice clients ("ophthalmology clients") $216,320 to purchase 54,750 applicators and transferred those applicators to plaintiff in order to trigger the second milestone payment of $4 million. The 54,750 applicators that the 27 clients purchased in the last four months of 2017 comprised more than 25% of all 2017 applicator sales. 
Defendant contends that the transfer of the applicators by the ophthalmology clients to plaintiff was prohibited by the asset purchase agreement. Defendant maintains that, due to plaintiff's alleged improper payments to the ophthalmology clients, the sales of the system could not reach the sales milestones set forth in the contract. Defendant asserts that termination of purchases by the ophthalmology clients prior to acquisition of the system from plaintiff demonstrates that it was not defendant's alleged failure to use commercially reasonably efforts to market, advertise, and sell the system that resulted in the system's failure. Rather, it was the decisions by ophthalmology practices to stop using the applicators that ultimately limited profits.
Plaintiff's Factual Allegations
The allergy testing system, developed by Dr. Loff, utilizes a proprietary "no needle/no [*2]shot" plastic applicator that is sold by Greer Laboratories. Plaintiff negotiated a distributor agreement with Greer Laboratories which provided plaintiff with the exclusive rights to promote, market, and distribute applicators to eye care professionals and which also prohibited Greer Laboratories from selling applicators to eye care professionals. Ophthalmology clients signed a contract including a "use" provision designed to prevent multi-office practices from transferring the allergens between offices due to allergy quality control concerns and to prevent practices from purchasing high volumes of applicators at a quantity discount and then reselling them to other clients. 
Following the launch of the allergy testing system in mid-2013, and until October of 2015, plaintiff hired part-time independent sales representatives. As a result of the representatives and plaintiff's management, 343 accounts were obtained for the allergy testing system in 45 states. 
In January of 2015, defendant approached Dr. Loff about acquiring plaintiff. During a meeting between Dr. Loff and defendant's Chief Executive Officer Michael Pearson (Pearson), Pearson represented that defendant valued plaintiff between $25 million to $30 million. Plaintiff maintains that Pearson represented that defendant favored purchasing companies by paying a part of the purchase price and deferring the balance to be paid as sales milestones, that it had a strong record of achieving sales milestones, and that defendant would implement a diagnostic division to increase sales. Although the parties agreed to a letter of intent for an agreement, prior to closing the agreement, defendant left the deal. 
Thereafter, defendant approached plaintiff to negotiate a new deal and proposed a $1.00 purchase price and sales milestones. Defendant's Senior Vice President, Tracy Valorie, explained that defendant intended to achieve the first two milestones and pay plaintiff $1 million, and pay $4 million within a year or two of closing, delaying the $5 million upfront payment which was initially—at lease conceptually—agreed to. Plaintiff maintains that defendant claimed that Greer Laboratories' exclusivity, along with defendants' sales coverage, would bring about the success. 
Due to defendant's proposed modified milestone structure with an up-front financial payment of only $1.00, plaintiff required that two provisions be included in the agreement to ensure that defendant would be invested in the success of the system. Plaintiff requested language requiring defendant to utilize "commercially reasonable efforts" to market, promote and sell the allergy testing system, and also required language allowing plaintiff to exercise "self-help" to supplement defendant's sales by purchasing applicators which would count towards the sales milestones if defendant's efforts were falling short. 
Plaintiff maintains that Dr. Loff spoke with Andrew Davis, defendant's Vice President of Business Development, and explained the purpose of the commercially reasonable efforts language and that the self-help language was required to allow plaintiff to facilitate sales and to "control its own destiny" (NYSCEF doc. no. 327, at 6). Davis allegedly accepted plaintiff's "self-help" language, but defendant initially rejected plaintiff's commercially reasonable efforts language and provided exceptions. After Dr. Loff spoke with Davis and plaintiff required defendant's express commitment to the growth and success of the system, defendant proposed allegedly acceptable commercially reasonable efforts language. 
In January of 2017, defendant asked to renegotiate the transaction and restructure the milestone payments. Plaintiff rejected the proposals and reminded defendant that the parties agreed to the original sales milestones with the understanding that it would likely produce a $19 [*3]million payout. Defendant also proposed giving the system back to plaintiff. 
Plaintiff claims that defendant did not properly commit salespersons to sell the allergy testing system, initially assigning a team of 19 sales representatives. In September of 2016, defendant transitioned to a team of sales representatives whose responsibilities were limited to lead generation. Although the number of representatives increased, the majority of the team were not certified for training during the time period in which they were assigned to promote the system. Plaintiff also charges that defendant also failed to enforce the Greer Laboratories agreement. 
In August of 2017, defendant instituted a sales purchase cap which plaintiff believes was imposed after large customer demand and purchases made it apparent that the second milestone payment was approaching. After learning about the sales cap, plaintiff commenced its "self-help" remedy. Plaintiff's CEO, Garrett Van de Grift, contacted David Freer (Freer), an ophthalmology practice consultant, to request that he encourage medical practices to purchase applicators. Plaintiff agreed to reimburse the practices for the amounts they paid to defendant. Between September through December of 2017, plaintiff transferred $250,000 to Freer to reimburse about 30 practices for 70,000 applicators which had been purchased from defendant. Plaintiff maintains that the purchases were needed to trigger the second milestone payment, which defendant failed to make.
DISCUSSION
Defendant's Motion in Limine
A motion in limine seeks a preliminary order excluding the introduction of anticipated evidence. A motion in limine challenges evidence that is claimed to be inadmissible, immaterial, or prejudicial, or requests a limitation on the use of evidence (Drago v Tishman Const. Corp. of New York, 4 Misc 3d 354, 359—60 (Sup. Ct. 2004) citing, State of New York v Metz, 241 AD2d 192, 198 [1st Dept 1998]).
An expert witness's opinion will be admissible if the expert "possesses the requisite skill, training, education, knowledge, or experience to render the opinion" (Brooklyn Union Gas Co. v Century Indem. Co., 162 NYS3d 691 (NY Sup. Ct. 2022) citing, Rosen v Tanning Loft, 16 AD3d 480, 481 [2d Dept 2005].) Here, defendant challenges Buthusiem's qualifications and ability to render an opinion on the marketing, promotion, and sales of ophthalmic products, based upon his purported lack of experience in the pharmaceutical sales industry (NYSCEF doc. no. 137, pgs. 6-7). This challenge to Buthusiem's work history, however, will not necessarily result in his preclusion. Criticizing expert testimony based on the expert's alleged lack of knowledge in a particular area of expertise goes to the weight and not the admissibility of the testimony (Board of Mgrs. of 195 Hudson St. Condominium v 195 Hudson St. Assoc., LLC, 63 AD3d 523, 524 [1st Dept 2009]).
Defendants further argue that Buthusiem should be precluded because Buthusiem purportedly failed to establish the objective standard of commercially reasonable sales efforts (id. at 11). Defendants cite to the federal court decision of Holland v FLSmidth, in support of this position (313 FSupp3d 477, 472 [SDNY 2018]).
The court in Holland analyzed the "commercially reasonable efforts" contractual provision and held: "[w]hen the term "commercially reasonable efforts" is not defined by the contract, courts in this district require the party seeking to enforce the efforts provision to [*4]establish the objective standard by which the breaching party's efforts are to be judged, in the context of the particular industry" (Holland Loader Co., LLC v FLSmidth A/S, 313 F Supp3d 447, 472 [S.D.NY 2018], aff'd, 769 F. App'x 40 [2d Cir. 2019]). Defendant submit that this finding requires preclusion of Buthusiem because he purportedly failed to establish the industry standard of reasonableness.
This court does not find that argument to be persuasive. The Holland decision merely provides the relevant standard for evaluating the contractual clause in circumstances, such as this, when the contract does not adequately define the term. The provision does not, as defendants suggest, compel preclusion of Buthusiem's testimony in this regard.
"Expert testimony is permissible when the subject matter involves information or questions beyond the ordinary knowledge and experience of the trier of the facts" (People v Ingram, 2 AD3d 211, 212 [1st Dept 2003]). To establish the objective standard of commercially reasonable efforts, Buthusiem discusses in his affidavit the importance of training, the appropriate size of a sales force, and how incentive compensation can impact sales in the industry. Buthusiem states that defendants' diagnostic team was never fully staffed and had high sales representative vacancies and turnovers and that the team had limited ophthalmic experience and needed additional coaching to develop relationships with customers. He states that in August of 2016, defendant decided to not expand the diagnostic team as originally planned and merged the diagnostic team into a different sales team that was promoting the allergy testing system as well as four other prescription products.
Buthusiem claims that defendant's use of webinars, instead of in-person training, was less effective for the allergy testing system. He asserts defendant failed to ensure that all salespersons completed web-based training and a certification protocol which was a prerequisite for a salesperson to be qualified to promote and sell the allergy testing system.
Buthusiem notes that, in August of 2017, defendant reduced the sales staff to three accountants, that defendant's customers reported that its sales force failed to maintain contact with their offices to support their use of the allergy testing system, that internal e-mails demonstrate that defendant hoped for slower sales and implemented a sales cap to limit the number of applicators a customer or practice could purchase, and that defendant failed to conduct significant investigation into any alleged breach of exclusivity clauses. 
Finally, Buthusiem posits that if defendant had employed sufficient sales efforts, it was likely that defendant would have achieved peak annual applicator sales of 1.5-2.3 million units, and peak annual revenue of $19-29 million in 2025. 
Buthusiem's testimony may assist in determining whether the defendant's actions met the requisite industry standard as set forth by the evidence, and may assist the fact finder in establishing whether defendant acted in a commercially reasonable manner and complied with its contractual obligations in the sale of the allergy testing system. Generally, "the weight to be afforded to the expert opinion is within the province of the trier of fact" (Credit Suisse First Boston, 80 AD3d at 487 [1st Dept 2011]). Preclusion of Buthusiem's testimony, at this juncture, is improper (Shimamoto v S & F Warehouses, Inc., 21 AD3d 266, 267 [1st Dept 2005] [the Appellate Division held that the lower court's dismissal of expert testimony proffered to establish market value and sales production was in error and held that the weakness of such evidence was for the jury to consider in determining whether plaintiff carried its burden of proof]).
Defendant's Motion for Summary Judgment
"The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). The burden then shifts to the motion's opponent to "present evidentiary facts in admissible form sufficient to raise a genuine, triable issue of fact" (Mazurek v Metropolitan Museum of Art, 27 AD3d 227, 228 [1st Dept 2006]). 
Breach of Contract
Defendant contends that the court should grant summary judgment as to plaintiff's cause of action for breach of contract because defendant utilized commercially reasonable efforts to market, promote and sell the allergy testing system. Defendant contends that its advertising, promotional, and marketing campaigns were commercially reasonable and that it retained agencies to create advertising and marketing campaigns. Defendant maintains that it implemented a diagnostic sales team with 19 sales territories, transitioned to three account specialists, undertook a business review, and decided to move the allergy testing system to a 95-person sales team. 
Defendant argues that its incentive compensation plan was commercially reasonable, that it hosted training programs, that it created a customer service protocol, and retained a third-party to manage customer service activities which included ordering and billing. Defendant contends that ophthalmology practices simply failed to adopt and utilize the product. Defendant maintains that, although plaintiff retained Edward J. Buthusiem to opine about whether commercially reasonable efforts were utilized, Buthusiem's opinions should not be considered in determining what constitutes commercially reasonable efforts.
In opposition, plaintiff contends that its claim for breach of contract should not be dismissed because defendant failed to use commercially reasonable efforts to market, promote, and sell the product. Plaintiff contends that defendant's failure to utilize commercially reasonable efforts is demonstrated by the size of the salesforce assigned to sell the system; the training, compensation, and efforts of the salespersons; defendant's failure to enforce the distributor agreement with Greer Laboratories; and the imposition of a quantity cap over unsubstantiated concerns that practices were making improper applicator purchases. Plaintiff contends that defendant breached the agreement when it failed to pay the second milestone payment.
The Appellate Division, First Department, has held that "[t]he elements of a cause of action for breach of contract are the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages" (Lebedev v Blavatnik, 193 AD3d 175, 182-183 [1st Dept 2021], quoting Harris v Seward Park Hous. Corp., 79 AD3d 425, 426 [1st Dept 2010]). 
Section 3.4 of the Asset Purchase Agreement between plaintiff and defendant provides, in part:
"3.4 Commercially Reasonable Efforts. The parties acknowledge and agree that Seller is agreeing to the Sales Milestones and Milestone payments based in part on Purchaser's position as an industry leader in the eye care industry and extensive sales force capabilities. Purchaser agrees to use commercially reasonable efforts to market, promote and sell the Products."
(NYSCEF doc. no. 140).
In this matter, the purchase agreement failed to adequately define what "commercially reasonable efforts" entails. When the term 'commercially reasonable efforts' is not defined by the contract, the party seeking to enforce the provision must establish the objective standard by which the breaching party's efforts are to be judged (Holland Loader Co., LLC, 313 FSupp3d at 472). The question of whether 'reasonable commercial efforts' have been undertaken is fact-intensive (Samson Lift Tech., LLC v Jerr-Dan Corp., 2014 NY Slip Op 33479 (U), *10 (Sup Ct, New York County, 2014) aff 139 AD3d 534 [1st Dept 2016]); see also Holland Am. Cruises, N.V. v Carver Fed. S&L Assn., 60 AD2d 545 [1st Dept 1977][ "the question whether defendant . . . acted 'in accordance with the reasonable commercial standards applicable to the business' of such defendant . . . presents a question of fact which precludes summary judgment"][citation omitted]).
In support of its motion, defendant submits an affidavit dated March 21, 2021 from David Fischer (Fischer), Vice President of Marketing at Bausch, which outlines the efforts defendant utilized to market the allergy testing system. Fischer states that the sales, marketing, advertising, and promotional campaigns included in-office patient posters, in-office "tent cards," banner advertisements displayed on websites, and "flashcards" distributed to various potential prescribers and ophthalmologists that summarized the allergy testing system.
Fischer states that defendant obtained testimonials from leading ophthalmologists and utilized targeted e-mails to eye care practices which highlighted the benefits of the allergy testing system, and reminder notes to ophthalmology practices. He states that sales representative Michael Brennan, and occasionally Dr. Loff, were sent yearly to national conferences. He states that defendant hired Shankman Marketing and Media Resources, LLC to provide a strategy to develop a media plan and utilized industry trade publications and articles. Fischer maintains that defendant had an online presence and hosted several in-person training events in 2015 and 2016. Fischer states that in the fall of 2016, Bausch implemented training for 95 sales representatives. 
Defendant also submits an affidavit dated March 11, 2021, from William Schoenberger (Schoenberger). Schoenberger is a business development and sales management consultant for ophthalmic diagnostic companies in the United States. Schoenberger states that he has over 38 years of experiences in the marketing, promotion, and sales of pharmaceutical and medical devices, which includes many years working with ophthalmic products and devices. 
Schoenberger maintains that defendant utilized commercially reasonable efforts. He states that defendant analyzed the market and created a reasonable pricing, marketing, advertising, and promotional strategy. Schoenberger states that defendants' training program complied with criteria required of professional sales training programs and that defendants' customer service was commercially reasonable and appropriate. Schoenberger concludes that it is his opinion that it was the ophthalmologists' refusal to adopt and continue to utilize the product which caused milestones to be missed, and not due to defendant's failure to use commercially reasonable efforts. 
In opposition to the motion for summary judgment, plaintiff submits a sworn affidavit from Buthusiem, signed under penalty of perjury and dated April 28, 2021. Buthusiem's sworn affidavit reviews his findings, further discusses his qualifications, and includes his expert report as an exhibit. Buthusiem was also deposed on December 1, 2020, and excerpts from such deposition have been submitted to the court which refer to his expert report. 
Buthusiem is the Managing Director at Berkely Research Group, LLC, with over 30 years of advising clients on a variety of business, regulatory, and transactional matters. He has served as General Counsel, Chief Compliance Officer, and Head of Business Development of KaVo Kerr Group, Danaher Corporation's global dental and medical device business. He was an attorney and business development executive at GlaxoSmithKline (GSK), a global pharmaceutical and consumer healthcare company and served in different capacities, including Vice President Global and Strategic Transactions, Senior Vice President, General Counsel, and Head of Deal Structuring for Pharmaceutical R&D, General Counsel and Head of Business Development of GSK's Vaccines Division, and Senior Vice President & Special Counsel.
Buthusiem was a member of an executive team within GSK, chaired GSK's Compliance Committee and served as a member of the R&D Scientific Advisory Board, and the GSK Product Review Board, which was the senior committee in GSK responsible for approving commercial agreements, and drug development projects as they move from pre-clinical to regulatory approval and launch.
Buthusiem states that he has drafted and negotiated hundreds of product development and commercialization agreements and has provided expert testimony and support in over 20 cases involving the exercise of commercially reasonable efforts. 
In his affidavit dated April 28, 2021, Buthusiem further attests that, in 1983, he received a Master of Arts in International Economics from the University of Brussels, which included graduate level courses in sales and marketing, that many of his roles throughout his 30-year career within the pharmaceutical industry focused on non-legal commercial functions, and that he has extensive experience in the diagnostic field, specifically allergy testing, as well as in the ophthalmic market. 
Upon review of Buthusiem's past professional work and his sworn affidavit, and over the objection of defendant which questions Buthusiem's experience in rendering an opinion, the court will consider Buthusiem's findings.
Buthusiem states in his sworn affidavit that defendant failed to use commercially reasonable efforts to market, promote, and sell the allergy testing system and instead took affirmative steps to limit promotional activities and sales. Buthusiem references the conclusions reached in his expert report and rebuttal affidavit.
Plaintiff also submits an affidavit of Dr. Loff, which is dated April 29, 2021, and which also appears to be critical regarding the reasonableness of the efforts of defendant to market and promote the allergy testing system. Dr. Loff states that, in or around December of 2015, he and his wife, who were paid to be consultants for defendant, assisted defendant with training new salespersons and transitioning the allergy testing system to Valeant. He states that the salespersons who attended the training also sold defendants' test for early detection of an immune system disorder and that two sales managers "were dismissive of and appeared threatened by the DAF System" (NYSCEF doc. no. 304, ¶ 46).
Dr. Loff also states that, in May of 2016, he and his wife attended an annual meeting planned by defendant, where a series of programs were executed. Dr. Loff maintains that the meeting was poorly attended, that defendant did not hold a "Technology & Innovation Showcase" on Friday May 6, 2016, specifically for the allergy testing system, and that the allergy testing system was not conspicuous to anyone who attended and was not located in a dedicated room with extensive materials or staffing which defendant has suggested. Dr. Loff states that, after that meeting, defendant did not request that he or his wife participate in any [*5]other tradeshows regarding the allergy testing system. 
Here, the evidence is in dispute as to whether commercially reasonable efforts were or were not utilized by defendant. The affidavits of Fischer, Schoenberger, Dr. Loff, and plaintiff's expert Buthusiem raise factual questions of whether adequate sales support was provided, whether the support team was engaged and adequately staffed, and whether the team was properly trained and certified. Conflicting testimony raises triable issues and is a basis to deny summary judgment (see Messina v New York City Transit Authority, 84 AD3d 439, 440 [1st Dept 2011]). Therefore, as a question of fact exists as to whether commercially reasonable efforts were made, the part of defendant's motion seeking summary judgment as to plaintiff's claim for breach of contract must be denied (see 3DT Holdings LLC v Bard Access Sys., 2022 WL 409082, *12, [SDNY 2022] [holding "a reasonable jury could find for either party on the question of whether Bard acted commercially reasonably, as determined in good faith and in its business judgment. . . ."]).
The Covenant of Good Faith and Fair Dealing
Defendant contends that it is entitled to summary judgment on its counterclaim for breach of the covenant of good faith and fair dealing, and that it is also entitled to summary judgment with regards to plaintiff's claim for breach of the covenant of good faith and fair dealing. 
Defendant contends that it and plaintiff agreed to the sales milestone arrangement because it was concluded that too much risk existed and that the allergy testing system's future sales may not be enough to justify paying millions of dollars up front to plaintiff. Defendant argues that an earn-out contract in which payments are made over time and based on product sales does not authorize the sellers to engage in self-dealing. 
Defendant argues that more than one-quarter of applicator sales in 2017 were sales to practices which made purchases because plaintiff paid them to do so. Defendant contends that the practices' purchases of applicators for the purpose of transferring the applicators to plaintiff was prohibited by the practices' contracts with defendant, that the 2017 sales do not represent the allergy testing system's fair value, and that plaintiff's payments to purchase the applicators distorted the fair value by artificially increasing sales and creating a misleading impression of an increased demand for applicators.
Defendant maintains that it had an exclusive agreement with Greer Laboratories, in which Greer Laboratories supplied applicators for the allergy testing system and defendant enforced the agreement in a commercially reasonable manner. Defendant contends that the monthly limit on applicator purchases and pricing was commercially reasonable. 
In opposition, plaintiff argues that it specifically negotiated the right to purchase applicators and that, with knowledge of plaintiff's efforts to execute its self-help remedy, defendant accepted the benefit of the increased sales revenue without objection. Plaintiff contends that the determination of whether a party acted in good faith or in bad faith in a willful or negligent disregard is a question of fact which is not appropriate for summary judgment. 
"The duty of good faith and fair dealing is an implicit obligation imposed on the parties to a commercial transaction" (Credit Suisse First Boston v Utrecht-America Fin. Co., 80 AD3d 485, 488 [1st Dept 2011]; see also Dalton v Educational Testing Serv., 87 NY2d 384, 389 (1995) [holding that "[i]mplicit in every contract is a covenant that in the course of performing the contract, neither party shall do anything which will have the effect of destroying or injuring the [*6]right of the other party to receive the fruits of the contract" [internal quotation marks and citation omitted]). "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement" (Gettinger Assoc., L.P. v Abraham Kamber Co. LLC, 83 AD3d 412, 414 [1st Dept 2011][citations and quotation marks omitted]; see also Singh v PGA Tour, Inc., 162 AD3d 556, 557 [1st Dept 2018][holding that summary judgment was properly denied as to the cause of action against defendant for breach of the implied covenant of good faith and fair dealing due to issues of fact which remain in dispute]).
Here, the testimony submitted by plaintiff and defendant differs as to whether the covenant of good faith and fair dealing was violated. For example, defendant submits an affidavit from Basil Imburgia (Imburgia) dated March 11, 2021. Imburgia is a Senior Managing Director in the Forensic & Litigation Consulting (FLC) practice of FTI Consulting, Inc., and the North American Leader of the FLC practice. Imburgia is a Certified Public Accountant, a Certified Fraud Examiner, and Certified in Financial Forensics. 
Imburgia states that the purpose of a sales milestone earn-out arrangement, such as the one in the asset purchase agreement, is to enable parties with different valuations to reach an agreement and defer the determination of the fair value of the asset being acquired and divested based on future sales. Imburgia states that reasonable parties to an agreement such as the asset purchase agreement would not believe that sales made as a result of a divesting party's payments to purchasers would be included in a valuation or a milestone calculation. Imburgia states that payments made by plaintiff to ophthalmology practices to purchase allergy testing applicators violate the economic purpose and intent of a milestone payment provision.
Imburgia states that the customer attrition rate confirms there may not have been a viable market for the allergy testing system where nearly two-thirds of the practices that purchased the 19,000 system from plaintiff stopped purchasing applicators or never purchased additional applicators and 61 percent of the practices that were eligible to cancel the auto-ship contracts cancelled or put them on hold by the time the parties executed the asset purchase agreement.
Furthermore, Schoenberger opines that defendants' implementation of an applicator limit was in response to potential fraud and was a commercially reasonable response to an increase in orders from a group of ophthalmology practices.
In opposition, plaintiff submits an affidavit from Dr. Loff who discusses how broad language was included in the asset purchase agreement to "cover any potential scenario wherein DAF helped facilitate sales of applicators by Valeant so as to reach the milestone levels" (NYSCEF doc. no. 304., at 13). Dr. Loff further states that plaintiff proposed language in each milestone payment sub-paragraph "to cover all eventualities by which DAF helped facilitate sales of applicators by Valeant" (id.). He states that a draft of the asset purchase agreement was provided by defendant, and defendant "accepted DAF's proposed self-help remedy language without modification."(id.). 
The affidavit of Garret Van De Grift (Van De Grift), plaintiff's Chief Executive Officer, dated April 29, 2021, provides that the intent regarding the asset purchase agreement required defendant to provide plaintiff with assurance that it would invest in the growth of the allergy testing system and would make appropriate efforts to achieve the sales levels which both parties knew could be achieved. 
Van De Grift states that plaintiff "required language to ensure that DAF had the ability to exercise 'self-help' to supplement Valeant's sales as needed by, among other things, purchasing [*7]the applicators, if needed, that would count toward the sales milestones if Valeant's efforts in a calendar year (whether intentional or not) were going to fall short of a milestone level during a calendar year" (NYSCEF doc. no. 315, ¶ 21). Van De Grift states that plaintiff insisted on adding language in each milestone payment subparagraph which referenced this concern. 
Buthusiem states in his sworn affidavit that that the "self-help" provision was designed as a safeguard in order to protect plaintiff from selling its business to defendant for less than what it was worth and recognizing that plaintiff was only paid $1.00 at the time of closing. Buthusiem states that defendant understood that plaintiff required this protection as it was taking a risk that defendant would generate sales to reach each milestone. Buthusiem states that defendant was aware of increasing sales in 2017 and that there was an increasing possibility of the milestone being met, so defendant took affirmative defendants to ensure that it would not meet the milestone.
Here, again the conflicting affidavits raise an issue of fact as to whether the covenant of good faith and fair dealing has been violated by either party (see Ansah v A.W.I. Sec. & Investigation, Inc., 129 AD3d 538, 539 [1st Dept 2015][holding conflicting affidavits preclude summary judgment]). While defendant contends that payments made by plaintiff to ophthalmology clients to purchase allergy testing applicators violate the economic purpose and intent of a milestone payment provision, plaintiff's witnesses state that the "self-help" provision was negotiated by both parties within the asset purchase agreement in order to support the achievement of sales milestones by facilitating sales of applicators. 
Here, as an issue of fact is presented as to whether either party violated the covenant of good faith and fair dealing, defendant's argument that it is entitled to summary judgment as to its counterclaim and to dismissal of plaintiff's claim for breach of the covenant of good faith and fair dealing must be denied.
Tortious Interference with Contract
Defendant contends that summary judgment must be granted in its favor as to its counterclaim for tortious interference with a contract. Defendant argues that a contract existed between itself and each ophthalmology client which state that an ophthalmology client should only purchase products and services for use by its practice including its trained technicians and that a practice shall only purchase the products and services for use by its authorized physicians. 
Defendant contends that plaintiff had knowledge of the contractual provisions because plaintiff assumed the contracts containing the provisions when defendant purchased the allergy testing system. Defendant argues that plaintiff breached the terms of their agreements, as plaintiff paid at least 27 ophthalmology clients to purchase applicators for the purpose of transferring the applicators to plaintiff. Defendant contends that it suffered damages due to plaintiff's tortious interference and incurred substantial attorney's fees and costs to defend against plaintiff's lawsuit. 
In opposition, plaintiff maintains that its own agreement with defendant authorized a "self-help" remedy and that the "use clause" in the client contracts was not intended to prohibit the type of activity at issue in defendant's tortious interference claim. Plaintiff maintains that, when it drafted the terms and conditions, it included the "use claim" to prohibit the multi-office practices of purchasing allergy testing systems and transferring them between offices. Plaintiff contends that the only damages which defendant allege in connection with this claim are for attorneys' fees.
To demonstrate a claim for tortious interference with a contract, several requirements must be met. A claim "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom" (Lama Holding Co. v Smith Barney Inc., 88 NY2d 413, 424 [1996]).
Here, a dispute exists as to the intent of the contractual language and whether the "use clause" in the practice contracts was intended to prohibit the type of activity at issue, specifically plaintiff making purchases of the applicators. At his deposition, Van De Grift testified that contractual language in the agreements with the practices which states "Practice shall only purchase the products and service for use by its authorized physicians," was included as he did not want the practices to order additional applicators to get a discount to give to another practice (NYSCEF doc. no. 271., at 117-118). It remains unclear if the provisions inclusion contemplated the possible "self-help" remedy by plaintiff. 
The Appellate Division, First Department, has held "[s]ummary judgment is appropriate only where the intent of the parties can be ascertained from the face of their agreement, and where determination of that intent requires resort to extrinsic evidence, summary judgment must be denied" (Ruttenberg v Davidge Data Sys. Corp., 215 AD2d 191, 197 [1st Dept 1995][internal quotation marks and citations omitted]).
Here, questions of fact exist as to the intent of the provisions in the contract between the practices and the defendant as well as the intent of the asset purchase agreement with regards to the possibility of applicator purchases by plaintiff for "self-help" purposes. Therefore, whether plaintiff's conduct constituted an intentional procurement of the third-party's breach of the contract without justification should be determined by the trier of fact. 
In conclusion, the part of defendants' motion seeking summary judgement as to its counterclaim for tortious interference must be denied.
Rescission and Declaratory Relief
Defendant contends that it should be entitled to rescission and declaratory relief regarding the milestone earn-out agreement. Defendant argues that the purpose of the milestone earn-out provision was to ensure that defendant paid fair value for the asset it bought. Defendant maintains that plaintiff paid practices to induce the practices to purchase applicators to trigger a $4 million milestone payment. Defendant argues that by artificially increasing sales, plaintiff caused the value of the allergy testing system to be overstated, which defeated the purpose of the milestone earn out agreement to determine fair value. Defendant contends that, therefore, rescission is an appropriate remedy. 
In opposition, plaintiff contends that defendant's conduct negatively impacted the value of the business, and that defendant cannot establish that plaintiff's applicator purchases defeated the purpose of the agreement because plaintiff specifically negotiated for, and defendant agreed to, the "self-help" provisions.
Here, as discussed above, as there are issues of fact regarding the intent of the contractual language and whether such conduct regarding the applicator purchases was agreed upon by both parties during the formation of the asset purchase agreement, the part of defendant's motion seeking summary judgment for its counterclaim for rescission of the contract must be denied (see Highbridge Advisory Council Family Servs., Inc. v Childcraft Educ. Corp., 74 AD3d 643, 643 [1st Dept 2010][holding issues of fact regarding allegedly fraudulent conduct preclude [*8]defendant's motion for summary judgment regarding the claim for rescission of contract]).
CONCLUSION
Accordingly, it is hereby
ORDERED that defendant Valeant Pharmaceuticals International's motion in limine to preclude the testimony of expert Edward J. Buthusiem (motion seq. no. 004) is denied, without prejudice; and it is further
ORDERED that defendant Valeant Pharmaceuticals International's motion for summary judgment (motion seq. no. 005) is denied.
DATE May 12, 2023
ROBERT R. REED, J.S.C.